**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 242 WALDO STREET, APARTMENT 2, RUMFORD, MAINE | Case No. 2:24-mj-26-KFW <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Christopher Concannon, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 242 Waldo Street, Apartment 2, Rumford, Maine, hereinafter the "PREMISES," further described in Attachment A for the things described in Attachment B.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), currently assigned to the Portland, Maine Field Office. I have been employed as an ATF Special Agent for approximately 18 years. My responsibilities include, but are not limited to, investigating firearms violations under Title l8 and Title 26 of the United States Code. I have received extensive training pertaining to investigations related to firearms trafficking and the acquisition of firearms through false statements ("straw purchases"). In the course of my law enforcement training and experience, I have conducted or participated in, among other things, surveillance, undercover transactions, debriefings of witnesses and defendants as well as reviews of recorded conversations and video relating to firearms trafficking and straw purchasing. I have drafted a number of firearm related search and arrest warrants and have assisted

in the execution of numerous search and arrest warrants involving firearms violations. Through my training and experience, I have become familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in firearms trafficking and straw purchasing.

3.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to provide facts demonstrating that probable cause for the requested warrant exists, and does not set forth all of my knowledge about this matter.

4.  The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

5.  I know from my involvement in this investigation that on about January 31, 2024, I obtained a federal search warrant that authorized me to utilize a device that can pinpoint the location of a cellular phone. I hereby adopt and incorporate by reference my affidavit filed in support of that warrant application, attached hereto as Exhibit 1.

**A. Execution of Search Warrant**

6.  I also know that on about February 1, 2024, I traveled to Rumford with other law enforcement agents to execute the warrant. An officer observed a black male wearing a gray sweatshirt run into 242 Waldo Street, who appeared to be similar height and build as ADEN MOHAMED. We then quickly determined that the Target Cell Phone was located in the area of 242 Waldo Street.

7. I observed a male, later identified as Target Subject Malcom Johnson, walk from 242 Waldo Street to a vehicle parked across the street, and then return to 242 Waldo Street. I made contact with Malcom. He identified himself to me, and I asked him who was in his apartment. I showed Malcom a photograph of ADEN MOHAMED. Malcom denied knowing the individual and said that individual was not in his apartment. Malcom initially declined a consent search of his apartment. Malcom ultimately consented to allowing law enforcement to check his apartment (Apartment #2, i.e., the PREMISES) to ensure that MOHAMED was not present inside.

8. I and other officers entered 242 Waldo Street following Malcom. Malcom walked ahead of us, and after he had passed through a door to the common hallway it closed and locked behind him so that I and other officers could not enter. An officer observed through the window of the locked door Malcom entering the PREMISES.

9. Officers requested a key to the common door from the landlord of 242 Waldo Street and were able to access the common area. As officers amassed in the common area, an individual officers knew to be Target Subject Terrence Johnson exited the PREMISES. Terrence indicated that he was taking his dog for a walk. Terrence then exited the common area.

10. While agents were amassed in the common area, I observed an individual I believed to be ADEN MOHAMED emerge from the PREMISES. Law enforcement officers arrested MOHAMED. I asked MOHAMED for his name, but he declined to provide it. I asked MOHAMED for his date of birth, but he declined to provide it. In order to verify MOHAMED's identity, MOHAMED's fingerprints were taken at the scene

and run through law enforcement databases. In this way, I was able to confirm MOHAMED's identity.

11. After MOHAMED was detained, I and Rumford Police officers determined that we would seek a warrant to search the PREMISES, because we believed that evidence of MOHAMED's firearm straw purchasing scheme, and evidence of drug trafficking, were likely present in the PREMISES. Officers conducted a sweep of the PREMISES to ensure that the PREMISES was empty, and that any evidence ultimately located within the PREMISES would stay intact while the search warrant was sought. Pursuant to the safety sweep, a woman who was later identified as Ariana Johnson, was located in the apartment. Officers escorted her to the common area and secured the now empty PREMISES.

12. I have learned from a conversation with ATF Resident Agent in Charge Nicholas Dilello that while the warrant was being sought, Ariana Johnson remained in the common area of the apartment. After some time had passed, Agent Dilello advised Ariana that she was free to leave and that she should go, as it may take several hours to obtain the search warrant. Ariana informed Agent Dilello that she would leave if she could reenter the PREMISES in order to retrieve her keys. Agent Dilello advised Ariana that she could retrieve her keys from the PREMISES provided that Agent Dilello accompanied her and observed her while she was in the PREMISES. Ariana agreed.

13. Ariana and Agent Dilello entered the PREMISES. Agent Dilello observed Ariana approach a blue backpack that she identified as hers, and begin rummaging around in the blue backpack. Agent Dilello noted that the backpack was embroidered with the name "Terrance" on the front pocket. As Ariana continued to

rummage through the backpack, Agent Dilello observed what he believed to be handgun inside the backpack. At that point, Agent Dilello escorted Ariana out of the PREMISES.

14. I conducted a post-*Miranda* interview with Malcom Johnson after he had been taken into custody at the Rumford Police Department, from which I learned the following, in substance and in part:

   a. Malcom lives at the PREMISES with his son. This morning, his brother Terrence and sister Ariana showed up with a person who was unknown to him. While the unknown male was sitting at a table in the kitchen area, he observed the male retrieve a silver pistol from a bag that was located near him, and then return the pistol to the bag. Malcom, Terrence, Ariana, and the unknown male smoked marijuana together.

   b. Malcom then left the PREMISES to retrieve items from his vehicle. When I questioned Malcom on the street, Malcom lied to me. He told me that he did not know the individual in the photograph I showed him, when in fact that individual was the unknown male inside the PREMISES.

   c. Malcom has his own Glock pistol that he purchased himself and keeps in a cabinet in his kitchen in the PREMISES. Malcom admitted he was a daily marijuana user, and that he used prescription medication within the past two weeks without a prescription.

15. I have reviewed an order for protection of abuse issued by Rumford District Court, Docket No. RUMDC-PA-2022-00152 against Terrence Johnson. The order indicates that, per its terms, Terrence is prohibited from possessing firearms.

### B. Historical Information

16. I have reviewed an incident report authored by a Rumford Police Department Detective on about January 25, 2023, from which I have learned the following, in substance and in part:

    a. Officers of the Lewiston Police Department stopped a car registered to Malcom Johnson after they observed a passenger (who was ultimately identified as Malcom) run out of an apartment and jump into the car. The officers initiated the stop because Malcom's license had been suspended.

    b. Jacolby Morrison was the driver of the vehicle. Morrison was on probation for drug trafficking charges. Officers allowed Morrison to leave. Later the vehicle was intercepted by officers of the Auburn Police Department, who conducted a traffic stop and searched the vehicle. Officers located 60 grams of fentanyl in Malcom's pants, and a loaded magazine in his backpack. Malcom admitted to officers that he had a firearm at home in Rumford.

17. I have reviewed a report summarizing information provided to the Rumford Police by a source of information ("SOI-1") relating to Malcom Johnson and Terrance Johnson from February 2023, from which I have learned the following in substance and in part:

    a. Malcom and Terrance reside on Waldo Street in Rumford. Both Malcom and Terrance are drug dealers. Malcom is a large supplier of cocaine within Rumford, and deals ounces of cocaine at a time. In addition to cocaine, Malcom and Terrance also deal methamphetamine and heroin.

    b. SOI-1 is aware that Malcom and Terrance are drug dealers because SOI-1 has been present while Malcom and Terrance conduct drug transactions. SOI-1

6

has also seen electronic messages referencing drug activity on cellular phones utilized by Malcom and Terrance.

  c. Terrance keeps a couple of eight balls (i.e., 1/8 of an ounce) of cocaine on his person for personal use, and carries up to two ounces of cocaine on his person for distribution. Terrance also carries between 10 to 15 tickets of heroin for sale. If Terrance has drugs on his person, he keeps them in his shoes.

  d. Terrance carries a handgun in his waistband. Terrance was in possession of a black handgun, a 45 ACP. Terrance has also been in possession of a 9-millimeter handgun that he stole from his roommate. Terrance has a high-powered rifle at his sister's house in Lewiston.

18. I have reviewed a report summarizing information provided to the Rumford Police by a source of information ("SOI-2") relating to Malcom Johnson and Terrance Johnson from March 2023, from which I have learned the following in substance and in part:

  a. SOI-2 observed two black males who appeared to be selling drugs from the Best Western Hotel in Rumford. A cab would pick up the males and transport them to known drug houses.

  b. SOI-2 provided two phone numbers that the black males were using. The first number, which was run through law enforcement databases, came back to Terrence Johnson, the brother of Malcom Johnson who resides at 242 Waldo Street in Rumford. At this time, Terrance was on bail.

19. I have reviewed a report summarizing information provided to the Rumford Police by a source of information ("SOI-3") relating to an individual believed to be Terrance Johnson from September 2023, from which I have learned that SOI-3

reported that an individual ("User-1") with whom SOI-3 had previously been incarcerated was being supplied with drugs by two black males. The officer who recorded the information provided by SOI-3 believed that one of the drug suppliers was Terrence Johnson, because the officer had seen Terrence sitting on User-1's porch on a number of occasions, and knew Terrance to be a drug dealer.

20. For the reasons detailed above and in Exhibit A, I believe that there is probable cause to believe that ADEN MOHAMED, and others known and unknown, have violated provisions of 18 U.S.C. §§ 371, 922(a)(6), and 924(a)(1)(A), and 21 U.S.C. §§ 846 and 841(a)(1) prohibiting the distribution of controlled substances. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

## TECHNICAL TERMS

21. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   b. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

   c. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

  22. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

  23. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the

9

data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

      d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

    24.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating

11

or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

25. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data,

13

including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

      a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

        c.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

        26.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

        27.    Because it is currently unknown whether the Target Subjects are the only individuals to reside at the PREMISES, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## **CONCLUSION**

        28.    I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

*[signature]*

Christopher Concannon
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Feb 01 2024

City and state: Portland, Maine

*[signature]*
*Judge's signature*

Karen Frink Wolf, U.S. Magistrate Judge
*Printed name and title*

16